SLIP OP. 08-121

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
GPX INTERNATIONAL TIRE                          :
CORPORATION and HEBEI                           :
STARBRIGHT TIRE CO., LTD.,                      :
:
Plaintiffs,                 :
v.                          :        Before: Jane A. Restani, Chief Judge
:
UNITED STATES,                                  :        Court Nos. 08-00285, 08-00286, 08-00287
:
Defendant,                  :        **Public Version**
:
and                         :
:
BRIDGESTONE AMERICAS HOLDING,                   :
INC., BRIDGESTONE FIRESTONE                     :
NORTH AMERICAN TIRE, LLC, TITAN                 :
TIRE CORPORATION, and UNITED                    :
STEEL, PAPER AND FORESTRY,                      :
RUBBER, MANUFACTURING, ENERGY,                  :
ALLIED INDUSTRIAL AND SERVICE                   :
WORKERS INTERNATIONAL UNION,                    :
AFL-CIO-CLC,                                    :
:
Defendant-Intervenors. :
_____:

## OPINION

[Plaintiffs' motion for a temporary restraining order and a preliminary injunction denied.]

Dated: November 12, 2008

Winston & Strawn, LLP (Daniel L. Porter, James Durling, and Matthew P.
McCullough); Hinckley Allen & Snyder LLP (Eric F. Eisenberg); Orrick, Herrington & Sutcliffe
LLP (John A. Jurata, Jr.) for the plaintiffs.

Gregory G. Katsas, Assistant Attorney General; Jeanne E. Davidson, Director,
Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice (John J. Todor and Loren M. Preheim); Irene H. Chen and Matthew D.
Walden, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce,
of counsel; James M. Lyons, General Counsel, Andrea C. Casson, Assistant General Counsel,

U.S. International Trade Commission (Rhonda M. Hughes and Peter L. Sultan) for the
defendant.

      King & Spalding, LLP (Joseph W. Dorn, Christopher T. Cloutier, Daniel L.
Schneiderman, J. Michael Taylor, and Kevin M. Dinan); Stewart and Stewart (Wesley K. Caine,
Elizabeth A. Argenti, Elizabeth J. Drake, Eric P. Salonen, Geert M. De Prest, Terence P.
Stewart, and William A. Fennell) for the defendant-intervenors.

      Restani, Chief Judge:  This matter is before the court on the motion of plaintiffs

GPX International Tire Corporation ("GPX") and Hebei Starbright Tire Co., Ltd. ("Starbright")

(collectively "plaintiffs") for a temporary restraining order and preliminary injunction to prevent

collection of full antidumping duty ("AD") and countervailing duty ("CVD") deposits.  GPX, a

domestic importer of certain off-the-road ("OTR") tires, and Starbright, a foreign producer and

exporter of certain OTR tires, seek immediate relief from the near 44% cash deposit requirement,

which they allege would impose such financial hardship as to cause permanent and irreparable

harm to GPX.  This motion is opposed by the Department of Commerce ("Commerce") and the

International Trade Commission ("ITC") (collectively "defendants"), as well as defendant-

intervenors Bridgestone Americas Holding, Inc., Bridgestone Firestone North American Tire,

LLC, Titan Tire Corporation, and United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC (collectively

"defendant-intervenors").

## BACKGROUND

      Commerce initiated AD and CVD investigations on July 30, 2007 for certain

pneumatic OTR tires from the People's Republic of China ("PRC") for the period of October 1,

2006 through March 31, 2007.[1]  See Initiation of Antidumping Duty Investigation: Certain New

Pneumatic Off-the-Road Tires From the People's Republic of China, 72 Fed. Reg. 43,591 (Dep't

Commerce Aug. 6, 2007); Certain New Pneumatic Off-the-Road Tires From the People's

Republic of China: Initiation of Countervailing Duty Investigation, 72 Fed. Reg. 44,122 (Dep't

Commerce Aug. 7, 2007).

        On July 15, 2008, Commerce published its final AD and CVD determinations

with respect to the subject merchandise from the PRC.  See Certain New Pneumatic Off-The-

Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at

Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed.

Reg. 40,485 (Dep't Commerce July 15, 2008); CVD Final Determination, 73 Fed. Reg. at

40,480.  On September 4, 2008, Commerce published an amended AD final determination and

AD order and a CVD order.  See AD Final Determination, 73 Fed. Reg. at 51,624; Certain New

Pneumatic Off-the-Road Tires from the People's Republic of China: Countervailing Duty Order,

73 Fed. Reg. 51,627 (Dep't Commerce Sept. 4, 2008).  In the final determinations, Commerce

calculated for Starbright an AD rate of 29.93% and a CVD rate of 14%.  AD Final

Determination, 73 Fed. Reg. at 51,625; CVD Final Determination, 73 Fed. Reg. at 40,483.  The

International Trade Commission ("ITC") published its affirmative injury determination on

---

[1] Among other tires, Commerce excluded from the scope certain larger construction and mining tires with a rim diameter equal to or exceeding 39 inches.  Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 73 Fed. Reg. 51,624, 51,625 (Dep't Commerce Sept. 4, 2008) ("AD Final Determination"); Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances, 73 Fed. Reg. 40,480, 40,484 (Dep't Commerce July 15, 2008) ("CVD Final Determination").

September 5, 2008.  See Certain Off-the-Road Tires from China; Determination, 73 Fed. Reg.

51,842 (ITC Sept. 5, 2008).

On September 9, 2008, plaintiffs filed three complaints with the court, contesting

the CVD determination (No. 08-00285), the AD determination (No. 08-00286), and the ITC's

injury determination (No. 08-00287).  Plaintiffs then filed a motion for a temporary restraining

order and a preliminary injunction to prevent the collection of the cash deposits while the merits

of these three cases are decided.

## DISCUSSION

### A.      Availability of Injunctive Relief

As a preliminary matter, contrary to the position of defendants, the court has the

power to grant injunctive relief to postpone the immediate collection of the full cash deposits

established by Commerce.  Congress provided for judicial review of AD and CVD investigative

proceedings that set deposit rates and it is these deposit rates themselves that are being reviewed

here.  It is not necessary to wait for a later phase of the case or for a later periodic administrative

review proceeding before commencing judicial review with its attendant remedies.  19 U.S.C.

§ 1516a(a)(2)(B)(i).  Further, the court has been granted broad injunctive powers and therefore,

the ordinary remedies provided under 19 U.S.C. § 1516a(c)(2) and (e) do not limit the court's

power to grant injunctions in extraordinary circumstances.  See 28 U.S.C. § 2643(c)(1) ("[T]he

Court of International Trade may . . . order any other form of relief that is appropriate in a civil

action, including . . . injunctions."); see also 28 U.S.C. § 1585 ("The Court of International Trade

shall possess all the powers in law and equity of, or as conferred by statute upon, a district court

of the United States.").

This conclusion is consistent with the jurisprudence of this Court and the Court of Appeals for the Federal Circuit ("Court of Appeals").  As Decca Hospitality Furnishings, LLC v. United States, 427 F. Supp. 2d 1249 (CIT 2006), explained, NTN Bearing Corp. of America v. United States, 892 F.2d 1004 (Fed. Cir. 1989), on which Commerce so heavily relies, focused on lack of a "final" decision in rejecting injunctive relief, but it appears that at the time the Court of Appeals was referring to lack of a final decision in the Court of International Trade case.  Decca Hospitality, 427 F. Supp. 2d at 1261 n.19; see also NTN Bearing, 892 F.2d at 1006.  Now we know that under the ordinary operation of the statutory scheme, suspended entries are not to be liquidated and estimated duties returned until a conclusively final decision, i.e., no appeal or certiorari petition denied.  See Yancheng Baolong Biochem. Prods. Co. v. United States, 406 F.3d 1377, 1381–82 (Fed. Cir. 2005).  NTN Bearing did not discuss remedies under USCIT Rule 65 because apparently the Court of International Trade neither labeled its decision an injunction nor provided any analysis of the factors warranting such an injunction.  See NTN Bearing, 892 F.2d at 1006 n.2.  Decca Hospitality also was not a USCIT Rule 65 case and does not resolve the issue here.  See Decca Hospitality, 427 F. Supp. 2d at 1257 n.14.  NTN Bearing specifically addresses what are appropriate remedies under the statutory scheme when an administrative error is found and a remand is ordered, but the case is not yet concluded in the Court of International Trade.  NTN Bearing, 892 F.2d at 1006.  It is clear that return of duties at this phase was particularly troubling to the Court.  Id.  NTN Bearing does not hold that no matter how wrong the agency decision might be, irreparable harm cannot be prevented until certiorari is denied. The court did not reach such a draconian conclusion in Queen's Flowers de Colombia v. United States, 947 F. Supp. 503 (CIT 1996) (deposit collection preliminarily enjoined), and the court

does not now apply <u>NTN Bearing</u> in such an overly broad manner.

In any case, what is clear is that this is not an <u>NTN Bearing</u> situation. The court would not be entering a partial judgment or a remand order and ordering a new deposit rate and return of duties. The court is not asked to void the estimated duty rate, but rather to allow plaintiffs to post some security instead of full cash deposits in order to prevent irreparable harm, until litigation in this case or an administrative review alters the situation.[2]

Plaintiffs, however, have "an extremely heavy burden" to meet and "[i]t is only in the rarest of instances that this form of injunctive relief will be granted." <u>See</u> <u>Queen's Flowers</u>, 947 F. Supp. at 506. In order to obtain a preliminary injunction, plaintiffs must establish the following four factors: (1) the threat of immediate irreparable harm; (2) the likelihood of success on the merits; (3) the public interest would be better served by the relief requested; and (4) the balance of hardship on all the parties favors plaintiffs. <u>Zenith Radio Corp. v. United States</u>, 710 F.2d 806, 809 (Fed. Cir. 1983). Congress provided for the collection of cash deposits for estimated duties, <u>see</u> 19 U.S.C. §§ 1671e(a)(3), 1673e(a)(3), and the court can act and grant temporary relief only if plaintiffs have satisfied the full four-factor test.

**B.    Evidence Issues**

To address the four factors relevant to a preliminary injunction motion, the parties chose to present their arguments and evidence to the court in essentially two ways. First, issues

---

[2]   The court does not agree with defendant-intervenor Titan Tire Corporation's position that the mere fact of an affirmative CVD or AD determination means that one has "unclean hands" and may not seek equitable relief. Titan is correct that plaintiffs have the burden of proving Commerce wrong under 28 U.S.C. § 2639(a)(1), but that is what plaintiffs are entitled to try to demonstrate. Further, it is quite a leap to assume that less than fair value sales and receipt of subsidies are the kind of behavior normally thought of as "unclean hands."

related to the likelihood of plaintiffs' success on the merits were addressed in briefing, which

included exhibits presented to the deciding agencies.  Those exhibits will eventually become part

of the administrative record to be filed with the court, so that it may perform its judicial review

based on that record pursuant to USCIT Rule 56.2.  On November 5, 2008, oral argument was

heard with respect to the likelihood of success on the merits issues, and the court excluded

certain exhibits presented at that time, on the basis of fairness and orderly presentation.  (See

Oral Arg. (Nov. 5, 2008).)  The first three of plaintiffs' ITC oral argument exhibits were

admitted and for continuity purposes are now marked Plaintiffs' Exhibits 5–7.  The parties then

reached an agreement to permit both plaintiffs' AD/CVD oral argument exhibits, now marked

Plaintiffs' Exhibits 8–14, and defendant-intervenors' AD/CVD and ITC oral argument exhibits,

marked Defendant-Intervenors' Exhibits A–D.  Presentation of excerpts from the yet-to-be

compiled agency record is a reasonable way to proceed with regard to likelihood of success on

the merits, as it is the agency record that is key as to that factor.

> Second, with respect to the other three injunction factors, an evidentiary hearing

was held the week prior to oral argument.  Plaintiffs' witness, Bryan Ganz, Chairman of the

Board of GPX, testified and various exhibits were admitted.  (See Prelim. Inj. Hr'g (Oct. 28,

2008), Pls.' Exs. 1–5.)  His affidavit filed with the briefing is of no moment, as it is clear that

both parties expect the court to rely on his trial testimony.  Further, injunction hearings are trials

de novo and testimony subject to cross-examination is required, unless there is agreement

otherwise.  Agreement was also reached to admit Plaintiffs' Exhibits 1–4 presented at the

November 5, 2008, hearing with respect to the three factors.  The remaining evidentiary issue

concerns Exhibit 16 to plaintiffs' AD brief, a declaration by Valerie Owenby, a consultant for

plaintiffs.  (See Mem. of Law in Supp. of Pls.' Mot. for TRO & for Prelim. Inj. (AD Case)

("Pls.' AD Br."), Ex. 16.)  This declaration attempts to establish that if Tianjin United Tire &

Rubber International Co., Ltd.'s ("TUTRIC"), another Chinese producer, and Starbright's data

were collapsed for purposes of calculating a single weighted-average AD margin, and all other

aspects of the calculation were held constant, a weighted-average margin of 8.02% would result.

(See id.)  Plaintiffs' view of the declaration is that apart from its obvious purpose of showing the

extent of Commerce's error, it (1) is relevant to a showing of the irreparable harm they are

suffering as a result of Commerce's alleged error, (2) weighs on their side in balancing

hardships, and (3) helps to define what the scope of the injunction should be.[3]

The declaration, obviously, is pure hearsay, but both sides discussed the exhibit as

if it were in evidence.[4]  Accordingly, the court ruled that any hearsay objections were waived

and it was admitted into evidence.  Such a declaration, however, has little probative weight.

Without testimony subject to cross-examination, this bare declaration accomplishes little.  This is

not a simple issue.  The declaration represents an opinion based on many factors that need

---

[3] Plaintiffs' position is, however, that they need not demonstrate that without
Commerce's errors any particular rate would be calculated in order for the court to rule that they
will likely succeed on the merits.  They believe demonstration of an error in procedure will do.
Nonetheless, plaintiffs wish the court to conclude that they will succeed at least to the degree
that their AD margin would be reduced to the 8% level.  Plaintiffs produced nothing of substance
to support their alternative claim that their duty deposit rate should be an average of the rate of
other parties.

[4] Commerce did state in its brief that this declaration was not part of the administrative
record.  (See Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. 10.)  This argument is irrelevant with
regard to three of the four injunction factors, and it is likely that some evidence extrinsic to the
administrative record would be permitted to demonstrate what an alternate calculation would be,
based on the administrative record evidence.

exploration. It does not establish that plaintiffs likely will succeed in demonstrating that the

administrative record, as properly interpreted, will lead to an 8.02% margin.  Given the lack of

attention of all parties to the niceties of evidence, if the court were convinced that a collapsing

error had occurred, the court would consider requiring live testimony on this issue.  That is not

the case.  Because the court finds that plaintiffs did not establish likelihood of success on the

merits of the collapsing issue, this evidentiary issue is essentially moot.

**C.      Likelihood of Success on the Merits**

        Because an injunction is an extraordinary remedy, it must follow that the court

will not disturb a well-founded administrative determination, even in the face of some

irreparable harm.  Accordingly, the court begins its analysis by reviewing plaintiffs' likelihood

of success on the merits.

       *1.      Injury Determination*

        Plaintiffs allege that error in the ITC's determination is the most critical to their

likelihood of success on the merits.  Arguably, if they are able to satisfy the success factor for the

ITC's determination, no cash deposits should be required as it would be unlikely that an order

should have issued at all.  The court has examined those parts of the ITC determination

challenged by plaintiffs in the injunction proceeding and for the following reasons cannot find

that plaintiffs will show that, based on alleged errors, this affirmative injury determination will

likely become a negative injury determination.  Those parts of the ITC determination challenged

by plaintiffs include the "like product" produced by the domestic industry, data selection, the

degree to which the subject merchandise was found to undersell the domestic industry and the

degree of injury to the domestic industry attributable to merchandise found to be unfairly traded.[5]

Determining the "domestic like product" is an inherently difficult factual

determination that is based on a variety of factors. The ITC appears to have evaluated all of the

factors and made the kind of like product determination that it normally makes when it faces a

range of U.S. manufactured goods potentially corresponding to the subject imported

merchandise. Here, the ITC found significant distinctions between the domestic like product and

other tires in physical characteristics and uses, common manufacturing facilities and employees,

and channels of distribution. Certain Off-The-Road Tires from China, USITC Pub. 4031, Inv.

Nos. 701-TA-448 & 731-TA-1117, at 6–10 (Aug. 2008), available at

http://hotdocs.usitc.gov/docs/pubs/701_731/pub4031.pdf. It also found a significant price

difference between its choice of a domestic like product comprising certain OTR tires for

agricultural, construction and industrial vehicles and equipment coterminous with the scope of

the investigations and plaintiffs' proposed broader domestic like product, the scope of which

included larger construction and mining tires. Id. at 6–7, 10. The "like product" determinations

appear to be substantially supported.

With respect to the selection of data used by the ITC to determine the volume and

market share of the subject merchandise, the ITC acknowledged that it was obligated to choose

from imperfect data sets, due to an incomplete response rate to importer questionnaires and

Harmonized Tariff Schedule subheadings that were not closely aligned with the scope of the

subject merchandise. Id. at 13. The ITC determined that although the questionnaire data likely

_____

[5] Because of emergency matters, plaintiffs did not fully develop all arguments that might
be made when this case is fully briefed.

understated the levels of subject and non-subject imports, the use of the questionnaire data was

endorsed by respondents, including plaintiffs, and was representative of the subject import trends

as experienced by the importers responding to the questionnaires.  Id. at 14–15.  The ITC also

disagreed with plaintiffs' contention that the volume of the imports should be determined by

weight, finding that the data for volume based on units and value was more complete on the

record.  Id. at 15.  The court does not find likely reversible error here.

    Additionally, with regard to its finding of underselling, which appears to be the

key injury causation issue, the ITC's characterization of the data on U.S. brand premiums as

being in the 10% to 15% range, rather than the 10% to 25% range, appears supported by the

evidence on the record before it.  See id. at 21 n.155.  The ITC noted that market participants

supplied estimates of premiums ranging from 3% to 50% or more, with the majority of estimates

ranging from 10% to 25%, and that an independent, published source indicated that a smaller

advantage of 5% to 10% existed for mining tires of certain premium brands.  Id.  It appears that

the evidence on price premiums before the ITC was sufficient under the standard of review to

support the finding of the ITC, even though it may have supported an alternate determination.

Thus, the court cannot say that plaintiffs are likely to succeed on the merits in demonstrating that

the brand premiums estimate relied on by the ITC to account for some of the underselling that

occurred was unsupported by substantial evidence.  See id. at 24–25.

    The court is also not persuaded by plaintiffs' arguments on the degree of injury to

the domestic industry by reason of the unfairly traded imports, including the effect of the

preliminary remedies and the domestic industry shift from smaller tires.  The ITC acknowledged

the mixed record on these issues, and these issues were simply too undeveloped, and likely

somewhat misdescribed by plaintiffs, for the court to find that plaintiffs would likely succeed on the merits. Id. at 26–29.

The court cannot find that plaintiffs are likely to succeed on the merits of the ITC determination because plaintiffs have not demonstrated any overarching legal error in the ITC's affirmative injury determination. Instead, plaintiffs contest the ITC's factual determinations, and the court has found that to the extent the issues have been developed here, there appears to be sufficient evidence on the record to support the ITC's factual conclusions. Accordingly, plaintiffs cannot demonstrate that they are likely to succeed in achieving a negative injury determination after judicial review.

2.      *Commerce AD Determination*

In the underlying Commerce AD case, plaintiffs allege that due to a close supplier relationship between GPX and TUTRIC, GPX's supplier from the PRC, GPX and TUTRIC should be found affiliated. As a result, plaintiffs argue Starbright and TUTRIC should be collapsed for purposes of calculating a weight-averaged margin. According to plaintiffs, this would result in an AD margin for Starbright of approximately 8%. (See Pls.' AD Br., Ex. 16.) Collapsing business entities based on control involves a multifaceted determination. See 19 U.S.C. § 1677(33) (definition of affiliated persons); 19 C.F.R. § 351.102(b)(3) (same); 19 C.F.R. § 351.401(f) (requirements for collapsing).[6] Plaintiffs rely on the long-term contract between

---

[6] In general, the following test must be met in order for Commerce to collapse two or more entities: "(1) the entities must be 'affiliated,' (2) they must 'have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities,' and (3) there must be 'a significant potential for the manipulation of price or production.'" Carpenter Tech. Corp. v. United States, 510 F.3d 1370,

(continued...)

GPX and TUTRIC, which entitles GPX to certain products from the TUTRIC factory at certain

prices, to demonstrate sufficient GPX operational control over TUTRIC to entitle Starbright and

TUTRIC to be collapsed.  Commerce, in contrast, argues that no control can be demonstrated

because there is a lack of ownership between TUTRIC and GPX, lack of evidence of

consolidation of financial statements, lack of influence over the other's capital structure or

financial costs, lack of voting rights, and a lack of dependence and reliance due to the sale of the

majority of TUTRIC's products to other customers around the world.  Issues and Decision

Memorandum for the Antidumping Investigation of Certain New Pneumatic Off-the-Road Tires

from the People's Republic of China, A-570-912, POR 10/1/06-3/31/07, at 131–41 (July 7,

2008), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16156-1.pdf.  Commerce further

argues that the acts of control alleged by GPX over TUTRIC, such as GPX's providing guidance

on product design and quality control, technical training and expertise concerning production,

and other assistance were merely evidence of commercial cooperation inherent in a business

relationship and do not amount to GPX's being in a position "to exercise restraint or direction"

over TUTRIC.  Id. at 135; see also 19 U.S.C. § 1677(33).

      While GPX and TUTRIC may have a close working business relationship,

plaintiffs have failed to show that their case is so similar to the small set of cases involving sole

suppliers that Commerce likely would be compelled to collapse TUTRIC and Starbright for

purposes of the AD determination.  See, e.g., Notice of Final Determination of Sales at Less

Than Fair Value: Stainless Steel Wire Rod From Korea, 63 Fed. Reg. 40,404, 40,404–05 (Dep't

---

[6](...continued)
1373 (Fed. Cir. 2007) (quoting 19 C.F.R. § 351.401(f)(1)).

Commerce July 29, 1998); Issues and Decision Memorandum for the Final Determination in the

Antidumping Duty Investigation of Live Swine from Canada, A-122-850, at 78–82 (Dep't

Commerce Mar. 4, 2005), available at http://ia.ita.doc.gov/frn/summary/canada/E5-1029-1.pdf.

In fact, testimony at the evidentiary hearing regarding production apart from the current contract

and overall control issues made it clear that Starbright does not have operational control of

TUTRIC.  Consequently, plaintiffs have not demonstrated a likelihood of success on the merits

regarding the affiliation between GPX and TUTRIC.

          The court is greatly concerned as to plaintiffs' alternate argument in the AD

context, that is, that Commerce did not even consider plaintiffs' request to give Starbright

market-oriented-enterprise ("MOE") treatment or to otherwise adjust for the new CVD treatment

applicable to the PRC.  Commerce determined in 2007 that for CVD purposes, "China's

economy is best characterized as one in which constrained market mechanisms operate alongside

(and sometimes, in spite of) government plans" and "though distorted, is observably more

flexible that the Soviet-style economies. . . . [which] were most notably characterized by the

absence of market forces."  Countervailing Duty Investigation of Coated Free Sheet Paper from

the People's Republic of China - Whether the Analytical Elements of the Georgetown Steel

Opinion are Applicable to China's Present-Day Economy, C-570-907 (Mar. 29, 2007), available

at Pls.' AD Br., Ex. 14, at 9. (''Georgetown Steel Memorandum'').  Despite Commerce's

conclusion that the PRC's economy had sufficiently changed so as to allow CVD measures

based on the calculation of subsidies for the PRC, see id. at 10, Commerce still refused to

consider MOE status for Starbright on the basis that Commerce had no set procedures for

handling such situations.  (See Pls.' AD Br., Ex. 15.)  Commerce has long stated that it needs

flexibility, that it looks at matters on a case-by-case basis, and that it can institute new

procedures when necessary, yet it rejected any attempt at doing so here.  Commerce did decide

in 2006 to continue non-market economy ("NME") treatment under the AD statute, but

circumstances have not remained static.  See Antidumping Duty Investigation of Certain Lined

Paper Products from the People's Republic of China ("China")-China's status as a non-market

economy ("NME"), A-570-901 (Aug. 30, 2006), available at Oral Arg., Pls.' Ex. 8.  Presumably

the PRC has continued to change and the 2007 CVD decision was itself a sea change.  See

Georgetown Steel Memorandum at 2, 10.  It is likely that Commerce erred in not addressing the

MOE issue.

    For their part, plaintiffs apparently provided information to Commerce that might

have been sufficient for Commerce to make a determination using market economy AD

procedures; however, plaintiffs have not gone the step further to demonstrate what the margins

likely would be if Commerce had granted Starbright MOE treatment.  In essence, plaintiffs

would require the court effectively to reduce the AD cash deposit rate temporarily to a 10% or

lower level based on their general statement that duties will change dramatically if such MOE

procedures are followed.  One might intuit that, but the court cannot determine that the cash

deposit rates should be at a certain level based on intuition alone.  While it may be a hard burden

for plaintiffs to establish within what range duties are likely to be if the proper procedures were

followed, plaintiffs' assertion, or even demonstration, of procedural error is not sufficient for the

court to make the proper decision it must make on the merits in this case regarding whether that

procedural error is likely to have significantly affected plaintiffs' AD margin.  Accordingly,

plaintiffs' allegations of procedural error do not demonstrate ultimate likelihood of success on

the merits in this AD case.  Plaintiffs' further allegations of calculation error have not been fully

developed in their AD brief in order for the court to accurately assess the likelihood of success

on the merits as to those claims.

       3.     *Commerce CVD Determination*

       Finally, with respect to the merits of the underlying CVD case, the leading case

on the application of CVD law to a NME is Georgetown Steel Corp. v. United States, 801 F.2d

1308 (Fed. Cir. 1986), whereby the Court of Appeals upheld Commerce's decision not to apply

CVD measures to NME countries.  This case is more than twenty years old.  It is also not clear

whether the Court of Appeals in interpreting the trade laws at issue in Georgetown Steel was

deferring to a determination of Commerce based on ambiguity in the statute or whether the Court

held that there was only one legally valid interpretation of the statute.[7]  See id. at 1314–18.

There is now guidance on how to proceed in such a situation, that is, National Cable &

Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967 (2005).  Brand X states

that in a case of this type of ambiguity, that is, when we are not sure what the court meant, for

stare decisis purposes we are to read the case as deciding that the agency determination at issue

did not conflict with the statute, not that a new agency reading, not before the court at the time,

must be rejected.  See id. at 982–86.  This does not tell us, however, if Commerce's new

interpretation of the statute—that it may impose CVD measures in NME countries—is

---

    [7]  The Court of Appeals speaks in very clear terms as to what the statute means, but near
the end of the opinion states, "[w]e cannot say that the Administration's conclusion that the
benefits the Soviet Union and the German Democratic Republic provided for the export of
potash to the United States were not bounties or grants under section 303 was unreasonable, not
in accordance with law or an abuse of discretion.  Id. at 1318 (citing Chevron, U.S.A., Inc. v.
Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984)).

reasonable or even if the aspect of the statute before us now is ambiguous.  As the outcome in this case is not directed by <u>Georgetown Steel</u>, the court must consider anew Commerce's new interpretation and application of the statute.[8]

   The law concerning CVD measures, 19 U.S.C. §§ 1671, 1677(5), has not changed since <u>Georgetown Steel</u> in any way relevant to this issue and, from 1986 to 2007, apparently Commerce accepted that the NME procedures specified in the AD laws were intended by Congress to cover the ground of the unfair trade remedies for NMEs.  Now Commerce says that conclusion is flawed.  The questions thus remain whether Commerce may (1) refuse in the AD context to use any market economy procedures in the PRC and apply the blunt procedures of the NME statute with its lack of fine-tuned adjustments, and (2) at the same time apply CVD measures to the same industry in the PRC.  Does this directly conflict with the statute?  Is this fundamentally unfair and thus an unreasonable interpretation or abusive application of the statute?  The court does not resolve these grave questions in the context of this preliminary injunction proceeding because, as will be discussed in Section D, success on these issues will not prevent the irreparable harm alleged by plaintiffs.

   Plaintiffs also attack the substance of that part of the CVD determination that resulted in a large part of the CVD rate, that is, a finding of debt forgiveness attributable to government action.  Plaintiffs allege that Commerce never made a finding of a financial contribution to Starbright, as required by 19 U.S.C. § 1677(5)(B), (D).  That is, they argue that

---

[8] The court's dismissal for lack of jurisdiction in <u>Government of the People's Republic of China v. United States</u>, 483 F. Supp. 2d 1274 (CIT 2007), in no way resolves this matter because that case involved only Commerce's authority to determine the parameters of its own investigation.

even if Starbright's predecessors were relieved of certain loan guarantee obligations by a

government-controlled bank, Commerce cannot presume that the benefit of the loan forgiveness

devolved to Starbright.  The court believes that this determination was made.  To greatly

simplify this discussion, Commerce, in essence, determined according to its ongoing policies

that the asset purchase form is of no moment and that Starbright bought assets from a partially

state-owned entity that were unburdened with debt allocable to such assets.  Issues and Decision

Memorandum for the Final Affirmative Countervailing Duty Determination: Certain New

Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic of China, C-570-913, at

126–27, 137–40, 148–50 (July 7, 2008), available at

http://ia.ita.doc.gov/frn/summary/PRC/E8-16154-1.pdf.  Commerce then turned to whether the

subsidy was extinguished by a fair market, arm's length sale to Starbright, i.e., a sale that

represented a fair price for the unburdened assets.  Id. at 128–36.  Thus, the determination of a

government financial contribution to Starbright likely was made through an acceptable

procedure.[9]

        Plaintiffs allege at least two more errors.  One is that Commerce failed to find that

Starbright paid fair market value for the assets in an arm's length transaction, thus extinguishing

any subsidy.  Commerce seems to have the better of this argument.  No appraisal was done until

after the negotiations for the sale.  Id. at 134.  The sales bidding was not completely open or well

advertised.  Id. at 135–36.  Certain parties were involved on both sides of the sales transaction.

---

[9] The court does not address defendant-intervenors' argument that the "butterfly" methodology is a separate, alternative method of finding direct countervailable subsidy to Starbright.

Id. at 124–36.  Plaintiffs' remaining argument is that, in any case, there was nothing to extinguish, i.e., the debt was already extinguished by operation of Chinese law, either before December, 2001, the cut-off date for considering subsidies in the PRC, or it was extinguished through generally applicable bankruptcy law, and not by action of a government-controlled bank after December, 2001.  The problem is that plaintiffs had the burden to demonstrate such occurrence timely before Commerce and in a convincing fashion.  An excerpt from Chinese law was rejected as submitted too late, but even if accepted, it is not clear that the Chinese law was fully proved or explained or that discharge in bankruptcy was demonstrated.  (See Pls.' Mem. of Law in Supp. of Pls.' Mot. for TRO & for Prelim. Inj. (CVD Case), Ex. 11.)  Plaintiffs also argue that the value of the subsidy was not properly calculated, but that argument was not developed with calculations to demonstrate the effect on the deposit rate.  Nonetheless, the court need not reach any final conclusion as to plaintiffs' likelihood of success on the CVD issues.  The court concludes that even if plaintiffs were likely to succeed in eliminating all of the CVD rate, because of the plaintiffs' failure to establish likely success in substantially reducing the AD rate or overturning the ITC injury determination, this limited likelihood of success on the merits is insufficient to tip the balance of equitable factors so as to require relief.

**D.      Irreparable Harm**

Mr. Ganz testified that only a cash deposit rate of 10% (or possibly slightly higher) will prevent irreparable harm.  [[

*Confidential Data Deleted*

Court Nos. 08-00285, 08-00286, 08-00287                              Page 20

*Confidential Data Deleted*

]]  For purposes of the motion the court accepts Mr. Ganz's testimony as true and assumes GPX established irreparable harm attributable to any deposit rate above the 10–15% range.

Assuming that plaintiffs have established that there is sufficient likelihood that the duty deposit rate should be approximately 30% rather than 44%, based on a reduction for eliminated CVD, and plaintiffs therefore are required to make a cash deposit of 30%, plus some security for the remainder, plaintiffs cannot prevail.  Plaintiffs have made it clear to the court through both argument and testimony that this is not the relief they seek and that plaintiffs cannot put up both such a cash deposit and the accompanying security.  At this point there has been no showing of a likelihood of success on the merits on the ITC's affirmative injury determination or Commerce's AD determination.  Success as to at least one of the two would be necessary in order for the court to provide any meaningful relief.

**E.      Remaining Factors**

Given that the court cannot grant the relief that will ameliorate the irreparable harm alleged by plaintiffs, it is unnecessary to do a full analysis of the balance of hardship and the public interest.  Suffice it to say that there would be hardships to defendants caused by the lack of adequate security in the form of cash deposits for duties potentially owed and also to defendant-intervenors due to the competitive disadvantage they would suffer if they did not

*Confidential Data Deleted*

receive the full remedies the agency granted them.  If Commerce's and the ITC's errors were

sufficiently clear so that plaintiffs were likely entitled to a duty rate at a level that would allow

them to continue operating their business in something close to normal mode, the hardships of

defendants and defendant-intervenors would pale in comparison to those harms potentially

suffered by plaintiffs.  But this is not the case here.  Similarly, while the public interest is served

by ensuring that government agencies follow the law exactly, it is also served by allowing the

statutory scheme to play itself out in the normal way, unless all of the injunction factors are

satisfied.

### CONCLUSION

Plaintiffs have not demonstrated a likelihood of success on the merits sufficient to

tip the balance of equitable factors so as to require relief.  For all the foregoing reasons,

plaintiffs' motion for a temporary restraining order and a preliminary injunction is denied.


                                         /s/ Jane A. Restani      
                                            Jane A. Restani
                                            Chief Judge

Dated: This 12th day of November, 2008.
        New York, New York.


*Confidential Data Deleted*

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                              Deputy Clerk